J-A17007-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| WILLIAM CLIFTON COTTRELL | : | |
| | : | |
| Appellant | : | No. 3210 EDA 2016 |

Appeal from the Judgment of Sentence August 22, 2016
In the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0006498-2015

BEFORE:   GANTMAN, P.J., RANSOM, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:                    **FILED JULY 31, 2017**

Appellant, William Clifton Cottrell, appeals from the judgment of sentence entered in the Bucks County Court of Common Pleas, following his jury trial convictions for burglary, aggravated assault, simple assault, and four counts of robbery.[1]  We affirm.

The trial court opinion accurately set forth the relevant facts of this case as follows:

> Appellant was convicted of robbing Fox McClure ("Mr. McClure") and Willie Mae McClure ("Mrs. McClure") [(collectively, "Victims")], an elderly couple, at gunpoint. On June 16, 2012, at approximately 2:00 in the morning, [Mr.] McClure arrived at his residence at 2200 Airacobra

_____

[1] 18 Pa.C.S.A. §§ 3502(a)(1)(i); 2702(a)(4); 2701(a)(3); 3701(a)(1)(ii), (iv), respectively.

_____

*Retired Senior Judge assigned to the Superior Court.

Street in Bristol Township, Bucks County, and exited his car. At that time, an individual came up behind him and told him that it was a "holdup." The individual demanded money from Mr. McClure, and he gave the individual $200 from his wallet. After receiving the money, the individual directed Mr. McClure to take him inside the house. On the way to the house, Mr. McClure dropped his keys. The individual told Mr. McClure to pick up the keys, struck Mr. McClure in the head with an object, and pressed that same object into Mr. McClure's back. The object was later identified as a gun.

Upon entering the house, Mr. McClure and the individual were met by Mrs. McClure. Mr. McClure told his wife that the individual was robbing them. At that point, [Victims] were able to get a look at the individual who was robbing them. [Victims] concluded that the individual was a male based on his voice and appearance. The man's face was covered with a bandana or ski mask.[2] His head was covered with a hooded jacket and baseball cap. Mrs. McClure saw that he was wearing boots and camouflage cargo pants. [Victims] could see that he was a "brown-skinned black man." Mrs. McClure estimated that the man was in his late twenties or early thirties and between five-foot-ten and six-foot-one with a medium build. [Victims] could clearly see that the man was holding a gun.

Thereafter, the man and [Victims] were in the bedroom of the house. The man directed [Victims] to "open their safe." Initially, Mr. McClure told the man that they did not have a safe. As a result, the man struck Mr. McClure in the head with the back of the gun causing him to fall to the floor. The man then pointed the gun at Mrs. McClure and threatened to kill her if they did not open their safe. Mrs. McClure noted that the gun emitted a laser beam, which was pointed directly at her.

Following the man's repeated threats, Mrs. McClure went

---

[2] The investigating officers said both Victims described the facial covering as a bandana and did not describe the covering as a ski mask during interviews following the events at issue.

to the safe, used the dial, and opened it. The safe housed antique silver dollars; the coins totaled $300 in face value but were likely far more valuable in the collectors' market. Mrs. McClure handed the coins over to the man.

After receiving the coins, the man directed Mrs. McClure to accompany him to the living room. Mr. McClure remained on the floor of the bedroom, dazed by the blow to his head. Once in the living room, the man pointed the gun at Mrs. McClure and told her to turn around. Mrs. McClure refused to turn around, and the man took a set of keys from [Victims'] piano and fled on foot from the house through the front door.

After the man escaped through the front door, Mrs. McClure called "911" while watching the man run across Airacobra Street into her neighbor's yard and then onto Fleetwing Drive. She lost sight of him as he was heading in the direction of Green Lane. Mrs. McClure contemporaneously provided these observations to the "911" operator.

At approximately 2:18 in the morning on June 16, 2012, Officer Keith Bertram, a K9 Officer with the Bristol Township Police Department, was in his patrol vehicle at a parking lot on Green Lane near Fleetwing Drive. Officer Bertram received a 2:23 a.m. emergency call over his police radio about a home invasion in the area of Airacobra Street. Police dispatchers alerted Officer Bertram that an individual in dark clothing was seen running across the turnpike near the ramp and access road.[3]

Officer Bertram arrived at the area of the ramp with his K9 partner, Apollo, within two minutes. He deployed Apollo

---

[3] About five minutes before receiving the dispatch, Officer Bertram had observed someone in dark clothing walking south on Green Lane in the direction of the turnpike. Officer Bertram testified that the part of the fence designed to block people from crossing the turnpike is cut or knocked down, and he has seen people cross the turnpike on foot through this opening.

and began tracking the area.[4] Apollo pushed Officer Bertram near houses along [the 5700 block of] Beaver Dam Road [on the odd-numbered side of the road]. Thereafter, Apollo "alerted" near a house on Beaver Dam Road with a fence and a pool. However, Officer Bertram did not see or speak with anyone at that location. Soon after, the tracking job was "called" and ended.

Next, Officer Bertram went to 2200 Airacobra Street to speak with [Victims]. [Victims] explained what happened to Officer Bertram and described the suspect as a black male who was approximately five-foot-eleven with a thin build. According to [Victims], he wore a dark hooded jacket, a dark hat, dark pants, and a bandana over his face, and he used a small, black semiautomatic pistol.

The same morning, between 2:30 a.m. and 3:00 a.m., the Hill family, who resided at 5725 Beaver Dam Road, heard a banging noise in their backyard. Michael Hill, upon hearing the banging noise and police sirens, walked out into his backyard to investigate the disturbance. While he was in the backyard, he saw a black man approach him from a deck area near the Hills' pool. Michael Hill described the man as six feet tall and in his mid-to-late thirties. The man was not wearing a mask and told Michael Hill that he would give him money if he did not say anything about their encounter. Michael Hill told the man to get out of his yard and then began shouting that the man police were searching for was in his backyard. Robert Hill, Michael Hill's father, observed the entire exchange while standing in the doorframe leading out to the backyard.

Later that same day, Michael Hill returned to the backyard and examined the pool deck, the area from which the man walked toward him. Under the deck, he discovered a dark hooded sweatshirt and a dark baseball cap. He then notified the Bristol Township Police about his discovery.

The Hills provided descriptions of the man to police. Michael Hill described him as a black man with cornrow-

---

[4] Apollo is trained in tracking to detect the freshest scent.

styled hair in the back and scruffy facial hair. Robert Hill described him as a black man with longer hair in the back and facial scruff.

Officer John Terman arrived at the Hill residence to follow-up and recover the items discovered under the pool deck. He located a dark hooded sweatshirt and a dark baseball cap under the pool deck and took them as evidence. Subsequently, a black and white bandana was recovered from inside the hooded sweatshirt. Officer Terman placed the items into evidence at the police station.

A navy blue "Yankees" baseball cap and a black and white bandana—both recovered by Officer Terman from the Hill residence—were sent to Christopher Johns, a forensic scientist for the Pennsylvania State Police. Mr. Johns tested the bandana and determined that a central part of it was indicative of saliva. He cut out this portion of the bandana and sent it to the DNA laboratory for analysis. In addition, Mr. Johns took a buccal swab from Appellant pursuant to a warrant and sent it to the DNA laboratory for analysis.

Amber Gegg, a forensic DNA analyst, received the bandana and baseball cap from Mr. Johns, as well as the DNA sample from Appellant, and conducted DNA testing. When examining the bandana, Ms. Gegg identified a partial DNA profile from an unidentified individual. By partial, Ms. Gegg explained that the profile contained 15 of the 16 "areas" identified when conducting DNA analysis. When she examined the baseball cap, Ms. Gegg identified at least three DNA profiles. However, one of the profiles contributed much more than the others and constituted a full DNA profile. By full, Ms. Gegg explained that the predominant profile contained 16 of the 16 "areas" identified by conducting DNA analysis.

In comparing Appellant's DNA sample with the partial DNA profile recovered from the bandana, Ms. Gegg determined, within a reasonable degree of certainty, that Appellant was a match. In comparing Appellant's DNA sample with the primary individual's DNA profile from the baseball cap, Ms. Gegg determined, again within a reasonable degree of certainty, that Appellant was a match. According to Ms.

Gegg, the odds of mistaking Appellant's DNA profile with another individual's DNA profile was one in 7.2 sextillion in the Caucasian population, one in 540 quintillion in the African American population, and one in 6.2 sextillion in the Hispanic population.

At trial, Detective Timothy Fuhrmann of the Bristol Township Police Department provided Appellant's age, height, and weight and explained that Appellant was 25 or 26 at the time of the offense and that he was six-foot-one and weighed 180 pounds at the time of his arrest. Detective Fuhrmann also testified that he saw Appellant in the community [in 2013] with a hairstyle that matched the Hills' description of the man found in their backyard.[5]

Appellant testified at trial on his own behalf. He denied robbing [Victims]; however, he was unable to offer an alibi. In addition, Appellant admitted to frequently wearing navy blue "Yankees" hats. He admitted to living at 913 Windner Drive at the time of the robbery, which is on the other side of the turnpike from the area of Green Lane, Fleetwing Drive, and Airacobra Street. He also denied ever having a long hairstyle in the back [since he was a child] and claimed to have never owned a bandana.

(Trial Court Opinion, filed January 27, 2017, at 1-6) (internal citations omitted).

Procedurally, police arrested Appellant in Bristol Township on July 28, 2015. Appellant proceeded to a jury trial on May 23, 2016. On May 25, 2016, the jury convicted Appellant of burglary, aggravated assault, simple assault, and four counts of robbery. The court sentenced Appellant on August 22, 2016, to an aggregate term of seven to twenty years'

_____

[5] Detective Fuhrmann also testified that the distance between Victims' residence and the Hills' residence is approximately one-half of a mile.

imprisonment. Appellant timely filed a notice of appeal on September 21, 2016. On September 26, 2016, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b); Appellant timely complied.

Appellant raises one issue for our review:

> WAS THE EVIDENCE THAT A MAN DESCRIBED DIFFERENTLY BY FIVE PEOPLE, NONE OF [WHOM] DESCRIBED THE CLOTHES THE COMMONWEALTH CLAIMS HE WORE THAT BORE DNA OF HIM AND OTHERS FOUND A HALF MILE AWAY FROM THE SCENE OF THE CRIME, SUFFICIENT TO PROVE THAT [APPELLANT] WAS THE PERSON WHO COMMITTED THE CRIMES FOR WHICH HE WAS CONVICTED?

(Appellant's Brief at 4).

When examining a challenge to the sufficiency of evidence:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part

or none of the evidence.

***Commonwealth v. Hansley***, 24 A.3d 410, 416 (Pa.Super. 2011), *appeal denied*, 613 Pa. 642, 32 A.3d 1275 (2011) (quoting ***Commonwealth v. Jones***, 874 A.2d 108, 120-21 (Pa.Super. 2005)).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Rea B. Boylan, we conclude Appellant's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (***See*** Trial Court Opinion at 10-12) (sufficient evidence existed to identify Appellant as man who burglarized, robbed, and assaulted Victims; on June 16, 2012, between hours of 2:00 a.m. and 3:00 a.m., Victims, Michael Hill, and Robert Hill all encountered person, in same part of Bristol Township, whom they identified as black male in his twenties or thirties, around 5' 10" to 6' 2", thin to medium build, wearing dark clothing; Victims specifically described robber as wearing dark hood, dark baseball cap, and dark bandana over his mouth; police dispatcher notified Officer Bertram of robber fleeing Victims' residence at approximately 2:23 a.m.; shortly thereafter, Michael Hill and his father, Robert Hill, encountered man in their backyard, who had hairstyle that was long in back, and offered Michael Hill money not to report interaction to police; after man left backyard, Michael Hill and Robert Hill found dark hooded sweatshirt and dark Yankees baseball cap under their pool deck; when police further examined sweatshirt, police

discovered black and white bandana inside sweatshirt; evidence from Hills' backyard was sent for DNA testing; forensic analyst determined within reasonable degree of certainty that Appellant's DNA was present on bandana and baseball cap; Detective Fuhrmann testified he saw Appellant within approximately one year of this incident and noted Appellant wore long hairstyle in back at that time; Appellant testified in his own defense and did not provide alibi; Appellant admitted he regularly wore navy blue Yankees' baseball cap; Appellant denied owning bandana; jury had opportunity to assess Appellant's testimony and to reject his testimony as incredible; Commonwealth presented sufficient evidence to prove Appellant was man who robbed Victims, fled to Hills' backyard, and stashed clothing under their pool deck; evidence was sufficient to support Appellant's convictions).

To summarize, the Commonwealth presented evidence that on June 16, 2012, at approximately 2:00 a.m., a black male in his twenties or thirties, approximately 5'10" to 6'2", wearing a black hooded sweatshirt, black bandana, and dark colored baseball cap, robbed Victims at gunpoint. The robber fled Victims' home on Airacobra Street to Fleetwing Drive, headed in the direction of Green Lane. Victims testified the robbery lasted about ten to fifteen minutes. At approximately 2:18 a.m., Officer Bertram was on patrol near Fleetwing Drive and Green Lane when he observed a person in dark clothing walking south on Green Lane in the direction of the turnpike. About five minutes later, at 2:23 a.m., Officer Bertram received a

radio dispatch regarding a home invasion at Airacobra Street. Officer Bertram also heard over the radio dispatch reports of a person running across the turnpike.

Officer Bertram, along with his tracking-trained dog Apollo, drove to the turnpike ramp. Officer Bertram noted there is a gap in the fence by the turnpike where people have cut-through in the past and walked across the turnpike. Apollo began tracking a scent and "alerted" Officer Bertram to the odd-numbered side of the street on the 5700 block of Beaver Dam Road. Officer Bertram and Apollo stopped in a backyard of a house containing a fence and a pool, but the track was "called" or ended when the officer did not see anyone there. Officer Bertram subsequently went to Victims' residence, where Victims described the robber and the events.

Meanwhile, Michael Hill and his father, Robert Hill, were at their residence at 5725 Beaver Dam Road when they heard a noise in their backyard around 2:30 or 3:00 a.m. Michael Hill went outside to investigate the disturbance and saw a black man, about six feet tall in his mid-to-late thirties, with a cornrow-styled hair in the back and scruffy facial hair. The man offered Michael Hill money if Michael Hill did not report their encounter. Michael Hill told the man to get out of his yard. Robert Hill observed the exchange and described the intruder as a black man with longer hair in the back and facial scruff. Later that day, the Hills discovered a hooded sweatshirt and baseball cap that did not belong to them under their pool

deck.

Officer Terman recovered the evidence from the Hill residence and found a black and white bandana inside the hooded sweatshirt. Forensic scientist Christopher Johns examined the evidence and sent portions of it to the DNA laboratory for analysis. Amber Gegg, a forensic DNA analyst, conducted DNA testing. Ms. Gegg identified at least three DNA profiles on the baseball cap, but she explained one of the profiles contributed much more than the others. In comparing Appellant's DNA sample with the primary individual's DNA profile from the baseball cap, Ms. Gegg determined, within a reasonable degree of certainty, that Appellant was a match. As well, in comparing Appellant's DNA sample with the partial DNA profile recovered from the bandana, Ms. Gegg determined, within a reasonable degree of certainty, Appellant was a match.

Detective Fuhrmann testified that Appellant was 25 or 26 at the time of the offenses and that he was 6'1" and weighed 180 pounds at the time of his arrest. Detective Fuhrmann also testified that he saw Appellant in the community in 2013 with a hairstyle that matched the Hills' description of the man found in their backyard.

Viewed in the light most favorable to the Commonwealth as verdict-winner, the evidence was sufficient to prove that Appellant was the man who had robbed Victims, fled across the turnpike to Beaver Dam Road, and stashed his clothing under the Hills' pool deck. **See Hansley, supra**. The

jury evaluated all of the Commonwealth's evidence as well as Appellant's testimony and was free to reject Appellant's testimony in favor of the Commonwealth's evidence. *See id.* Our role as an appellate court is not to substitute our judgment for the fact-finder. *Id.* The evidence in this case logically and legally connected Appellant to the offenses and was not so weak or inconclusive as to preclude a guilty verdict. *Id.* Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judge Ransom joins this memorandum.

Judge Platt concurs in the result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/31/2017